UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| WESTFIELD INSURANCE COMPANY, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-0617-RLY-TAB |
| | ) | |
| SHEEHAN CONSTRUCTION | ) | |
| COMPANY, INC., and VINCENT B. | ) | |
| ALIG, M.D., and MARY JEAN ALIG, | ) | |
| Individually, Co-Trustees of the MARY | ) | |
| JEAN ALIG REVOCABLE TRUST, and as | ) | |
| Representatives of A Class of All Others | ) | |
| Similarly Situated, | ) | |
| Defendants. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This case involves a dispute over the Plaintiff's coverage obligations to its insured

for damages caused by substandard construction.  Plaintiff Westfield Insurance Company

("Westfield") has brought this action to clarify its coverage obligations based on the

insurance policy held by Defendant Sheehan Construction Company, Inc. ("Sheehan").

Sheehan has counterclaimed for breach of duty to act in good faith, breach of contract,

and for declaratory relief that Sheehan should be indemnified by Westfield.

In another action in the Marion Circuit Court (the "underlying lawsuit"), Sheehan

settled with a class of homeowners ("Class Members") whose homes were built by

Sheehan for damage done to their houses by subcontractors' deficient construction.   The

Aligs, the original plaintiffs in the underlying lawsuit, and the Class Members are also

named as defendants in the instant action.

The instant matters before the court are Plaintiff's and Defendants' Cross-Motions for Summary Judgment.  Westfield has requested summary judgment declaring that it is not required to indemnify Sheehan under the policy it issued to Sheehan.  Sheehan and the Class Members have requested summary judgment declaring that Westfield does owe it a duty of indemnification, and that Westfield's initial denial of coverage was both a breach of duty to act in good faith and a breach of contract.  For the reasons set forth below, Plaintiff's Motion is **GRANTED**, and Defendants' Motion is **DENIED**.

## I.   Background and Procedural History[1]

The events surrounding this case date back to at least April 2000, when Defendants Vincent and Mary Jean Alig ("the Aligs") purchased a home located at 4621 Crystal Lake Lane, in Indianapolis, Indiana.  (Am. Compl. ¶¶ 2.2, 2.3.)  Sheehan was the general contractor for the construction of the Aligs' home, but it did not do any of the construction on the home itself; rather, that was left to various subcontractors with whom it had contracted.  (Marion Cir. Ct. J. Entry ("Judgment Entry") ¶ 3, Ex. 3 to Defs.' Mem. in Resp.)

In early 2004, several years after the Aligs moved into the home, they noticed water entering their house near some windows on the south side of the home.  (Am.

---

[1]  The court is without a sufficient evidentiary record to support some of the background facts in this case.  However, because the parties are in agreement on all pertinent facts, the court cites to the Amended Complaint or other party-submitted documents for all otherwise-unsupported background facts.

Compl. ¶ 2.4.)  The Aligs' homeowners insurer had an engineering investigation performed to determine the cause of the water intrusion.  (*Id.* at ¶¶ 2.4, 2.5.)  The investigation revealed that substandard construction practices had resulted in the water intrusion and corresponding damage to the Aligs' home.[2]  (*Id.* ¶ 2.5.)  In mid-2004, the Aligs retained counsel, David McNamar, who on several occasions made contact with Sheehan regarding the damage to the Aligs' home.  (*Id.* at ¶ 2.6.)

Sheehan denied liability for the repairs the Aligs requested, and the Aligs filed suit against Sheehan in Marion Circuit Court on November 17, 2004.[3]  (*Id.* at ¶ 2.11.)  On January 18, 2005, the Marion Circuit Court certified a class of plaintiffs in the lawsuit consisting of those homeowners in the Crystal Lake Subdivision whose homes were constructed by Sheehan and experienced similar damage.  (*Id.* at ¶ 2.15; *see also* Class Action Certification, Ex. F to Am. Compl.)

On October 1, 2004, Westfield issued a Commercial Package Policy (the "Policy") to Sheehan.  (Am. Compl. ¶ 2.9.)  When the Aligs sued, Sheehan requested Westfield defend and indemnify it under the Policy.  (Am. Compl. ¶ 2.13.)  On December 30, 2004, Westfield denied coverage and refused to defend Sheehan.  (Westfield's Dec. 30, 2004, Letter to Sheehan, Ex. 1 to Pl.'s Mem. In Supp.)  It reiterated this denial on March 30, 2006, in response to the class action suit.  (Westfield's Mar. 30, 2006, Letter to Sheehan's

---

[2]  Damage to the home included window leaks at the corners of the windows, deterioration in the OSB plywood located behind the wood siding, fungus growth, decayed window frames, and carpet that was water-stained and molding. (Judgment Entry ¶ 5.)

[3]  Cause No. 49C01-0411-PL-004144.  (Am. Compl. ¶ 2.11.)

Counsel, Ex. 6 to Pl.'s Mem. in Supp.)  On April 28, 2005, after the Class had been

certified, Westfield filed its Complaint for Declaratory Judgment in the present action,

seeking declaratory relief as to its duty to defend and indemnify Sheehan under the

Policy.  An Amended Complaint for Declaratory Judgment was filed on September 26,

2006.  In its Answer to the Amended Complaint, Sheehan counter-claimed, arguing that

Westfield's denial of coverage was in bad faith.

On May 24, 2007, the Marion Circuit Court issued a Judgment Entry in the

underlying lawsuit approving a proposed settlement between the Class and Sheehan for

$2,769,782.73, with $1,982,495.95 of that total being designated for the cost of repair to

the defective construction of the Class Members' homes.  (Judgment Entry ¶ 13.)  Upon

the filing of the Judgment Entry, Sheehan assigned to the Class Members its claim for

coverage under the Policy.  (Pl.'s Mem. in Supp. 10.)  Westfield's declaratory action will

now determine whether Sheehan has a right to be indemnified by Westfield under the

Policy.

## II.    The Policy

The Policy at issue in this case was issued by Westfield to Sheehan on October 1,

2004.  Its policy period ran from October 1, 2004, through October 2, 2005.  (Am.

Compl. ¶ 2.9.)  The Policy's Commercial General Liability ("CGL"), Bodily Injury and

Property Damage coverage insuring agreement reads in part:

> *a. We will pay those sums that the insured becomes legally obligated*
> *to pay as damages because of "bodily injury" or "property damage" to*
> *which this insurance applies. We will have the right and duty to defend the*

4

*insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. But:*

> *(1) The amount we will pay for damages is limited as described in Section III - Limits Of Insurance; and*

> *(2) Our right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements under Coverages A or B or medical expenses under Coverage C.*

*No other obligation or liability to pay sums or perform acts or services is covered unless explicitly provided for under Supplementary Payments – Coverages A and B.*

*b. This insurance applies to "bodily injury" and "property damage" only if:*

> *(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";*

> *(2) The "bodily injury" or "property damage" occurs during the policy period; and*

> *(3) Prior to the policy period, no insured listed under Paragraph 1. of Section II – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.*

(CGL Form 1.)

The Policy defines the term "occurrence" as meaning "an accident, including

5

continuous or repeated exposure to substantially the same general harmful conditions."

(CGL Form 14.)  It defines "property damage" as follows:

*"Property Damage" means:*

*a.  Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or*

*b.  Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.*

(CGL Form 15.)

The Policy defines the term "products-completed operations hazard" as follows:

*"Products-completed operations hazard":*

*a.  Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:*

*(1) Products that are still in your physical possession; or*

*(2) Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:*

*(a) When all of the work called for in your contract has been completed;*

*(b) When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.*

*(c) When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.*

6

*Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.*

*b.  Does not include "bodily injury" or "property damage" arising out of:*

> *(1) The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured;*

> *(2) The existence of tools, uninstalled equipment or abandoned or unused materials; or*

> *(3) Products or operations for which the classification, listed in the Declarations or in a policy schedule, states that products-completed operations are subject to the General Aggregate Limit.*

(CGL Form 15.)

By endorsement, the Policy contains the following "Fungi or Bacteria" exclusion:

*A.  The following exclusion is added to Paragraph 2., Exclusions of Section I – Coverage A – Bodily Injury And Property Damage Liability:*

*2. Exclusions*

*This insurance does not apply to:*

*Fungi or Bacteria*

> *a.  "Bodily injury" or "property damage" which would not have occurred, in whole or in part, but for the actual, alleged or threatened inhalation of, ingestion of, contact with, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.*

7

*b. Any loss, cost or expense arising out of the abating, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of "fungi" or bacteria, by any insured or by any other person or entity.*

*This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for consumption.*

*\* \* \**

*C. The following definition is added to the Definitions Section: "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi.*

(CGL Endorsement #1.)

Also by endorsement, the Policy contains the following "damage to your work"

exclusion:

*Exclusion 1. of Section I – Coverage A – Bodily Injury And Property Damage Liability is replaced by the following:*

*2. Exclusions*

*This insurance does not apply to:*

*l. Damage To Your Work*

*"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".*
The Policy defines the term "your work" as follows:

*"Your work":*

*a. Means:*

*(1) Work or operations performed by you or on your behalf;*

8

*and*

*(2) Materials, parts or equipment furnished in connection with such work or operations.*

    *b. Includes:*

*(1) Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and*

*(2) The providing of or failure to provide warnings or instructions.*

(CGL Endorsement #2.)

    Finally, the Policy contains a "General Liability Expanded Endorsement," (the "GLEE"), which adds:

*This endorsement modifies insurance provided under the following:*

*COMMERCIAL GENERAL LIABILITY COVERAGE PART*

*\* \* \**

*3. The following coverages are added to SECTION I – COVERAGES: VOLUNTARY PROPERTY DAMAGE*

*1. Insuring Agreement*

*We will pay, at your request, for "property damage" to property of others caused by you, or while in your possession, arising out of your business operations. The amount we will pay for damages is limited as described in SECTION III – LIMIT OF INSURANCE.*

*2. Exclusions*

*Coverage for Voluntary Property Damage does not apply to:*

*\* \* \**

*d. The cost of repairing or replacing:*

> *(1) "Your work" defectively or incorrectly done by you; or*
>
> *(2) "Your product" manufactured, sold or supplied by you; unless the "property damage" is caused directly by you after delivery of "your product" or completion of "your work" and resulting from a subsequent undertaking.*

*e. "Loss" of property caused by or arising out of the "products-completed operations hazard".*

\* \* \*

*8. SECTION V – DEFINITIONS is amended as follows:*

*The following definition is added:*

*20. "Loss" means unintentional damage or destruction but does not include disappearance, theft, or loss of use.*

(CGL Form CG 70 36 02 02.)

## III.   Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C).  The court's role is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.  *Winters v. Fru-Con Inc.*, 498 F.3d 734, 744 (7th Cir. 2007) (citing *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001)).  A genuine issue of material fact exists

whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

When determining if a genuine issue of material fact exists, the court "must construe all facts and reasonable inferences in favor of the nonmoving party." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citing *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007)). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Then, the nonmoving party must "go beyond the pleadings" to show "that there is a genuine issue for trial." *Id.* at 324.

Ordinarily, when facing cross-motions for summary judgment, a trial court is required to consider each motion separately, construing the facts most favorably to the non-moving party in each instance. *DT Floormasters v. United States*, No. 4:07-cv-0112-DFH-WGH, 2008 U.S. Dist. LEXIS 52827, at *4-5 (S.D. Ind. July 10, 2008). In this case, however, the parties' motions for summary judgment regarding Sheehan's claim for indemnity confront the same issues and the underlying facts are not in dispute. The court will therefore address the parties' cross-motions for summary judgment jointly.

## IV. Applicability of Indiana Law on Interpreting Insurance Policies

This case is before the court based on diversity jurisdiction, and the parties have agreed that Indiana substantive law applies. Therefore, the court must apply Indiana law as it predicts the Supreme Court of Indiana would apply it. *Clark v. State Farm Mut.*

*Auto. Ins. Co.*, 473 F.3d 708, 712 (7th Cir. 2007.)

Under Indiana law, the interpretation of an insurance policy is a question of law

for the court. *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992). This makes summary

judgment on the interpretation of this Policy "particularly appropriate." *Am. Family Mut.*

*Ins. Co. v. Hall*, 764 N.E.2d 780, 784 (Ind. Ct. App. 2002). If the language in an

insurance policy is clear and unambiguous, the court will give it its plain and ordinary

meaning. *Tate*, 587 N.E.2d at 668. Any ambiguities in the language of the Policy are to

be construed in favor of Sheehan as the insured party. *Am. Family Mut. Ins. Co.*, 764

N.E.2d at 784 (citing *Meridian Mut. Ins. Co. v. Auto-Owners Ins. Co.*, 698 N.E.2d 770,

773 (Ind. 1998)). However, the court should not find that an ambiguity exists simply

because the parties disagree on a particular interpretation of a provision. *Meridian Mut.*

*Ins. Co. v. Cox*, 541 N.E.2d 959, 961 (Ind. Ct. App. 1989). With these standards in mind,

the court will now address the issues the parties raise in their Motions for Summary

Judgment.

## V.  Duty to Indemnify

In determining whether Westfield owes a duty to indemnify Sheehan from the

Judgment Entry in the underlying lawsuit, the court must engage in a three-step inquiry:

first, it must find "property damage" as defined in the Policy; second, it must find that this

property damage was caused by an "occurrence"; and third, it must find the coverage for

property damage is not subject to any exclusions contained within the Policy. As

explained below, the court finds none of these to be present, meaning Westfield has no

duty to indemnify Sheehan.  Accordingly, Westfield is entitled to summary judgment on the issue of indemnification.

### A.    "Property Damage"

The Policy states that Westfield will pay to Sheehan "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies."  "Property damage" is subsequently defined as "physical injury to tangible property, including all resulting loss of use of that property." Westfield argues that the damage to the Class Members' houses does not constitute "property damage" because the Judgment Entry was for the purpose of repairing faulty workmanship, which is not "property damage" under Indiana law.  Sheehan responds by arguing that while faulty workmanship, without more, is not "property damage," here the faulty workmanship caused damage to other parts of the homes, and this damage qualifies as "property damage" under the Policy.  Before examining Indiana law on "property damage," it is beneficial to examine in greater detail the nature of the damage done to the Class Members' homes and the faulty workmanship which caused this damage.

The Class Members' homes experienced many different types of damage, including:  water leaks around windows; water stains below windows and on ceilings; discolored carpet; warped floors; roofing materials blowing off during storms; mold below windows, on floors, in crawl spaces, and on the homes' siding; and decay of window frames and OSB sheathing.  (Judgment Entry ¶ 5.)  These problems were caused by numerous faults in workmanship:  a lack of flashing and caulking around windows; a

lack of house wrap over OSB sheathing and window casements; improperly installed roof

shingles; improperly sealed openings in roofs for chimneys and vents; improperly

installed bricks, including a lack of weep holes, a lack of flashing, and bricks being

installed too close to exterior walls; improperly installed cement board siding; and

improper ventilation of crawl spaces.  (*Id.* at ¶ 7.)

CGL policies envision two types of risks arising from contractors' work.  The first

is the business risk that a contractor will have to pay to repair faulty workmanship that is

unsatisfactory to a home buyer.  *Indiana Ins. Co. v. DeZutti*, 408 N.E.2d 1275, 1279 (Ind.

1980).  This risk is uninsurable and excluded under CGL policies.  *Id.*  The second type of

risk is "that the goods, products or work of the insured, once relinquished or completed,

will cause bodily injury or damage to property *other than* to the product or completed

work itself."  *R.N. Thompson & Associates, Inc. v. Monroe Guaranty Insurance Co.*, 686

N.E.2d 160, 162 (Ind. Ct. App. 1997) (emphasis in original).  This type of risk *is* covered

by CGL policies, and serves to limit contractors' tort liability for damage to property

caused by their work.  *Id.*

In *R.N. Thompson*, a builder/developer of 45 buildings was sued for breach of the

implied warranty of habitability when the roof decking on some buildings was damaged

due to degradation of the plywood used for portions of the roofs.  The damage was caused

by a combination of improper attic venting, dryers venting directly into attics, and roofs

being built in a substandard manner.  686 N.E.2d at 161.  The Indiana Court of Appeals

found that claims limited to remedying faulty workmanship or materials does not involve

14

"property damage." *Id.* at 163.  Instead, the costs of repairing faulty workmanship is an

"economic loss" not covered by CGL policies.  *Id.* at 164.

Similarly, in *Amerisure, Inc. v. Wurster Construction Co.*, 818 N.E.2d 998, 1004

(Ind. Ct. App. 2004), the Indiana Court of Appeals held that the cost of repairing two

defective exterior finishing systems on a newly constructed building was not "property

damage," since there was no damage to property other than to the project itself.  The only

damage was to the exterior of the building caused by the defective exterior systems,

which the Court said was not covered by the CGL.  *Id.*

Sheehan argues that both *R.N. Thompson* and *Amerisure* are distinguishable

because in both, the faulty workmanship constituted the extent of the damage.  Here,

Sheehan argues, the faulty workmanship caused damage to components of the house that

were not otherwise faulty.  Sheehan essentially seeks to draw a distinction between faulty

workmanship itself and the damage caused to the homes on account of the existence of

the faulty workmanship.  For example, inadequate sealing of the windows and roofs of

the Class Members' houses (i.e. faulty workmanship) allowed water to enter and cause

damage to carpets, floors, and walls (i.e. damage to otherwise non-faulty property).  In

support of its argument, Sheehan cites to:  *Selective Insurance Co. of the Southeast v.*

*Cagnoni Development, LLC*, Case No. 1:06-cv-0760-DFH-TAB, 2008 U.S. Dist. LEXIS

2162 (S.D. Ind. Jan. 10, 2008) (applying Indiana law); *Travelers Indemnity Co. of*

*America v. Moore & Associates*, 216 S.W.3d 302, 311 (Tenn. 2007); and *U.S. Fire*

*Insurance Co. v. J.S.U.B., Inc.*, 979 So.2d 871, 890-91 (Fla. 2007).

*Selective Insurance* involved water damage to a warehouse caused by the faulty design and installation of a new roof.  2008 U.S. Dist. LEXIS 2162, at *1, 5-6.  There, the court held that the damage to the warehouse itself due to faulty workmanship was not "property damage."  However, the court determined that the damage to other personal property contained within the warehouse, which was caused by the leaking roof, did constitute "property damage" for the purposes of a CGL policy.  *Id.* at *31-32.

*Travelers Indemnity*, from the Tennessee Supreme Court, involved damage to the walls and room furnishings of a newly-constructed hotel caused by improperly installed windows.  216 S.W.3d at 304.  The Court there held that the defectively-installed windows were not "property damage," but the damage caused by the faulty installation, including water penetration and mold, was "property damage."  *Id.* at 310.

Similarly, *U.S. Fire*, from the Supreme Court of Florida, held that a claim for the cost of repairing a subcontractor's defective work was not "property damage," but a claim for repairing the structural damage to a completed home from the subcontractors' defective work was "property damage."  979 So.2d at 890-91.

The court simply cannot accept Sheehan's argument that the damage to the otherwise non-defective parts of the houses damaged by faulty workmanship constitutes "property damage."  First, this conclusion is not consistent with Indiana law.  In *R.N. Thompson*, the Court of Appeals found that the damage to the roofs in the affected houses was "economic loss," not "property damage."  686 N.E.2d at 164.  However, using Sheehan's reasoning, the Court *should* have found that the cost of actually replacing the

damaged plywood was "property damage," since fixing the decayed roof plywood was distinct from literally fixing the faulty workmanship–that is, the attic venting, the substandard construction of the roof, and venting dryers into the attic.  The Court in *R.N. Thompson* instead found that the damage to the roof's plywood, caused by excessive heat and moisture brought about by faulty workmanship, was inseparable from the actual faulty workmanship, and was, therefore, *not* "property damage."  *Id.*  Here, the damage to the Class Members' homes, although caused by water penetration and not faulty workmanship directly, is not to be treated as distinct from the underlying faulty workmanship which allowed the water penetration.

This understanding of *R.N. Thompson* is consistent with a more recent case, *Cincinnati Insurance Co. v. Crossman Communities Partnership*, No. 05-470-KSF, 2008 WL 817086, at *10 (E.D. Ky. Mar. 20, 2008) (applying Indiana law), where the Eastern District of Kentucky, applying Indiana law, concluded that "any damage that did not extend beyond the faulty workmanship of the general contractor-insured is not considered 'property damage' under Indiana law."  The facts of *Crossman* are similar to the instant case, in that subcontractors performed most or all of the work on several houses built by the defendant general contractor, and the faulty workmanship of certain subcontractors led to water damage in a number of the houses at issue.  *Id.* at *1.

After a thorough review of Indiana's CGL policy law, the court in *Crossman* determined that when Subcontractor A's faulty workmanship damages Subcontractor B's undamaged work, "any costs associated with the repair of any 'component' of the houses

built by [Subcontractor B], whether existing of faulty construction or non-defective work, are not 'property damage' under the CGL policy and Indiana law." *Id.* at \*10.  This is so because under Indiana law, a general contractor's product is the entire project or house which he built and sold, including all component work done by subcontractors.  *DeZutti*, *supra*, 408 N.E.2d at 1280.  Therefore, in this case, any repair costs by Sheehan due to the faulty workmanship of its subcontractors is not 'property damage.'

Because, under Indiana law, a general contractor's product is the entire project, *Selective Insurance* is distinguishable.  There, what the court found to actually be "property damage" was personal property stored within the warehouse, which was in no way connected to the work product of the general contractor.  Here, however, although damage to non-faulty components are distinct from the faulty workmanship itself, those non-faulty components are still part of Sheehan's work product.  *See DeZutti*, 408 N.E.2d at 1280.  Therefore, the court cannot treat the damage to non-faulty components as being distinct for the purposes of determining whether there is "property damage."

Likewise, the court cannot accept Sheehan's argument that the precedent set by the Tennessee and Florida Supreme Courts ought to be adopted by the State of Indiana.  This court is bound to follow the law it predicts the Indiana Supreme Court would apply, *Clark*, *supra*, 473 F.3d at 712, and Sheehan has given no viable reason for this court to predict that the Indiana Supreme Court would depart from the precedent set by the Indiana Court of Appeals in recent years.  Sheehan argues that the Indiana authority upon which this court relies is outdated and unsound due to a 1986 change in the language of

18

the standard CGL policy form which has the effect of not excluding work performed entirely by subcontractors.[4]  Sheehan contends that this change in policy reflects an intention on the part of the insurance industry to cover such faulty workmanship in CGL policies, and that *R.N. Thompson* and its progeny ignore this change.

*R.N. Thompson* recognized the 1986 change in language, 686 N.E.2d at 163 n.5, but found it to be irrelevant since there was no "property damage" involved, as is the case here.  Further, Sheehan's Policy contains an endorsement ("Exclusion - Damage to Work Performed by Subcontractors on Your Behalf") specifically undoing the 1986 change in the standard policy language.  The court is not convinced that the Indiana Supreme Court would undo the well established law of the state on the interpretation of "property damage" in CGL policies.  Accordingly, the court finds that there is no "property damage" present in Sheehan's claim, and as such, Westfield does not owe Sheehan a duty of indemnity.  Summary judgment on this issue should be **GRANTED** in favor of Westfield.

### B.    "Occurrence"

Even if the court accepted Sheehan's argument that the water damage brought about by faulty workmanship constitutes "property damage" under the Policy, the court must also find that this "property damage" was caused by an "occurrence."  The Policy defines "occurrence" as an "accident, including continuous or repeated exposure to

---

[4]  This 1986 change adds a clause to the "Damage To Your Product" exclusion,  which states that "this exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

substantially the same general harmful conditions."

While not defined in the Policy, *R.N. Thompson* explained that in the context of insurance coverage, an "accident" is "an unexpected happening without an intention or design." 686 N.E.2d at 164 (quoting *Terre Haute First Nat'l Bank v. Pac. Employers Ins. Co.*, 634 N.E.2d 1336, 1338 (Ind. Ct. App. 1993)). Determining the construction of the terms "occurrence" and "accident" as a matter of first impression in Indiana, the *R.N. Thompson* Court held that degradation of the plywood used as roof decking was the natural and ordinary consequence of the work done by the contractor or under its supervision. As such, it was not an "accident" or "occurrence," but a breach of contract for faulty workmanship and defective materials. *Id.* at 165. Further, the *R.N. Thompson* Court held that CGL policies "[do] not cover an accident of faulty workmanship but rather faulty workmanship which causes an accident." *Id.* (quoting *DeZutti*, 408 N.E.2d at 1279).

The *Amerisure* Court recognized that "a majority of courts have determined that faulty workmanship is not an accident, and therefore, not an occurrence." 818 N.E.2d at 1004. There, the Court held that the failure of the exterior finishing systems was the natural and ordinary consequences of the defective work done under the general contractor's supervision. *Id.* at 1005. Further, "the natural and ordinary consequences of an act do not constitute an accident." *Id.* (citing *Indiana Ins. Co. v. Hydra Corp.*, 615 N.E.2d 70, 73 (Ill. App. Ct. 1993)).

The Court in *Jim Barna Log Systems Midwest, Inc. v. General Casualty Insurance*

20

*Co. of Wisconsin*, 791 N.E.2d 816 (Ind. Ct. App. 2003), dealt with how negligently-performed workmanship may affect the "occurrence" analysis.  There, the Indiana Court of Appeals reasoned that "an allegation of negligence is not necessarily an allegation of accidental conduct as defined in the context of a [CGL] insurance policy."  791 N.E.2d at 825.  The Court understood that the proper analysis should focus on the "accidental nature of the conduct," not the accidental nature of the results of the conduct.  *Id.*

*Crossman* applied this same reasoning, holding that "any damage to the non-defective components of the houses was also the natural and ordinary consequence of the faulty work done by [the general contractor] or by subcontractors under its supervision and, therefore, not an 'accident.'"  2008 WL 817086, at *11.

Here, neither the faulty workmanship nor the damage done to the Class Members' homes is an accident.  Based on the nature of the faulty workmanship, including improperly sealed window joints and roofs and a lack of house wrap, the fact that water penetrated the homes is certainly the natural and ordinary consequence of the defects.

Sheehan, however, argues that the faulty workmanship caused continuous exposure of the inside of the homes to moisture, which caused unforeseen and unintended damage.  Specifically, Sheehan points to *R.N. Thompson*, which holds that CGL policies cover "faulty workmanship which causes an accident."  686 N.E.2d at 165 (quoting *DeZutti*, 408 N.E.2d at 1279.  It argues that the damage to the Class Members' homes is an accident caused by the subcontractors' faulty workmanship.

In so construing damage in this case, Sheehan again focuses on the distinction

21

between the faulty workmanship and the actual damage caused to the homes.  However,

Sheehan overlooks the fact that under *R.N. Thompson* and its progeny, the damage to

those homes is the natural and ordinary consequence of the faulty work–it is not

accidental.  Since the damage to the Aligs' and Class Members' homes is not an

"accident," this case simply cannot be seen as one where "faulty workmanship . . . causes

an accident."  *Id.*

      Sheehan again requests that the court disregard Indiana precedent, arguing once

more that the cases upon which the court relies fail to properly take into consideration the

effect of the 1986 change in the language of CGL policies.  It again points the court's

attention to *U.S. Fire*, the Florida Supreme Court case that held that "faulty workmanship

that is neither intended nor expected from the standpoint of the contractor can constitute

an 'accident and, thus, an 'occurrence' under a post-1986 CGL policy." 979 So.2d at 888.

Sheehan argues that the Indiana cases fail to properly take into consideration the

distinction between work performed by the general contractor and work performed by

subcontractors.

      As discussed above, the court does not find the 1986 changes in the standard CGL

policy form to be an adequate reason to depart from Indiana precedent, especially in this

case where the Policy specifically undoes the 1986 change.  Further, the court finds that

the Indiana cases do take the contractor/subcontractor distinction into sufficient account.

This is especially true because the work performed by subcontractors on behalf of a

general contractor *is* the work of the general contractor.  *DeZutti*, 408 N.E.2d at 1280.

The Indiana law on "occurrence" is clear and well-established, and Sheehan has provided the court with no indication that the Indiana Supreme Court would depart from the holding in *R.N. Thompson* and its progeny.  Accordingly, the court finds that any alleged "property damage" was not caused by an "occurrence."  Therefore, Westfield does not owe Sheehan a duty to indemnify Sheehan in the underlying lawsuit, and Westfield's Motion for Summary Judgment on the issue of indemnification should be **GRANTED**.

###### C.       Exclusions and Exceptions

Regarding exclusions from insurance coverage, Indiana law is clear that "if the insuring clause does not extend coverage, one need look no further."  *Crossman*, 2008 WL 817086, at *11 (citing *Amerisure*, 818 N.E.2d at 1005).  Because the court has determined that there is no initial coverage since there is no "property damage" caused by an "occurrence," the court does not need to consider the relevancy of any exclusions.  However, because the parties addressed certain exclusions in their Motions for Summary Judgment, the court will consider each exclusion individually.

###### 1.       "Damage to Your Work" Exclusion

The "Damage to Your Work" exclusion states that the Policy will not extend to "'[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  By "your work," the Policy means "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations."  "Products-completed operations hazard," previously defined above, simply refers to any project Sheehan has already fully

completed.  This would, therefore, include the Aligs' and the Class Members' houses.

Westfield argues that because "your work" is defined so as to include all work performed by subcontractors on Sheehan's behalf, this exclusion denies coverage to any "property damage" done to Sheehan's projects once they reached completion.  Sheehan argues that this exception is ambiguous and should be read in favor of the insured party, and further, that the nature of this exception is contrary to the intent of insurance companies in post-1986 forms.

While any ambiguities must be construed in favor of Sheehan, *American Family Mutual Insurance Co.*, *supra*, 764 N.E.2d at 784, the court may not simply determine an ambiguity exists because the parties disagree on the interpretation of a provision, *Meridian Mutual Insurance Co., supra*, 541 N.E.2d at 961.  Here, the court finds no ambiguity within this particular exception.  Assuming, *arguendo*, that "property damage" exists in this case and was caused by an "occurrence," that damage occurred to Sheehan's "work," which includes all work performed by subcontractors.  Contrary to Sheehan's assertion, there is no ambiguity created here merely because Sheehan did not actually do any of the construction on these homes.  The damage occurred to the Class Members' homes *after* Sheehan and its subcontractors had finished their work, meaning the homes were included in the "products-completed operations hazard" provision.  Therefore, by the terms of this exclusion, Westfield would not owe a duty of indemnification to Sheehan to cover the damage at issue in this case.

Sheehan correctly points out that the 1986 change in the standard CGL policy

24

language to this exception exempted the "Damage to Your Work" exception if the work at issue was performed by a subcontractor.  *See* Note 4, *supra*.  However, Sheehan agreed to the endorsement that explicitly removed the post-1986 subcontractor exception. Indiana has a long recognized a "very strong presumption of enforceability of contracts that represent the freely bargained agreement of the parties."  *Trotter v. Nelson*, 684 N.E.2d 1150, 1152 (Ind. 1997) (quoting *Cont'l Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.*, 669 N.E.2d 134, 139 (Ind. 1996)).  Sheehan does not argue that the Policy was not freely bargained for, nor does it suggest any policy reason for why the parties should be able to, by mutual agreement, depart from what Sheehan argues is the post-1986 intent of the insurance industry.  Therefore, Sheehan is bound by this exception, which the court finds excludes from coverage the damage to the Class Members' homes.

### 2.    "Fungi or Bacteria" Exclusion

Westfield argues that the damage to the Class' Members' homes is further barred by the "Fungi or Bacteria" exclusion, added to the Policy by an endorsement.  This endorsement excludes from coverage any liability for "'bodily injury' or 'property damage' which would not have occurred, in whole or in part" but for the presence or contact with "fungi."[5]  Much of the damage to the Class Members' homes was caused by

---

[5]   The Policy defines "fungi" broadly, including "any type or forum of fungus, including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi."

water penetration, and some part of that damage involved some mold or mildew.[6]  The court is thus satisfied that to the extent that damage to the Class Members' homes involved any fungus or mold, that damage would be otherwise excluded from coverage.[7]

### 3.    General Liability Expanded Endorsement

Westfield argues Sheehan's claim for indemnity is also excluded by the GLEE. The GLEE adds voluntary property damage coverage, but the Policy indicates that it does not apply to the cost to repair or replace Sheehan's work or losses included in the "products-completed operations hazard."

The GLEE operates to exclude coverage here on two bases.  First, the underlying suit involves repairing or replacing Sheehan's "work," which as defined by the policy, includes all work by subcontractors on Sheehan's behalf.  Second, the underlying lawsuit involves damage to the Aligs' and Class Members' completed homes, which are included in the "products-completed operations hazards."  The court therefore finds that as a matter of law, the GLEE also serves to exclude Sheehan's claim for indemnity.[8]

### 4.    Known Claim Exception

---

[6]  Mold was found under many windows, and excess moisture was found in crawl spaces and between the exterior and interior walls, which presumably involved some mold.  (Judgment Entry ¶¶ 5, 7(e), & 7(g).)

[7]  Sheehan has made no counter-argument on this exclusion; thus it has waived any objection it may have had with this issue.  *See Watson v. Auto Advisors, Inc.*, 822 N.E.2d 1017, 1027 (Ind. Ct. App. 2005) (holding that when parties fail to provide argument and citations, their arguments are waived).

[8]  Sheehan has not made a counter-argument on this issue and has waived any objection to it.  *See Watson*, *supra* note 7, 822 N.E.2d at 1027.

Westfield finally argues that any damage to the Aligs' home is excluded from coverage, since Sheehan became aware of the damage prior to the Policy's inception date, October 1, 2004. The Policy's Insuring Agreement states that the Policy only covers "bodily injury" or "property damage" if: "(3) Prior to the policy period, no insured . . . knew that the 'bodily injury' or 'property damage' had occurred, in whole or in part." On June 21 and 25, 2004, the Aligs' counsel sent letters to Sheehan asserting claims for damages due to defective construction of their home. (Exs. A and B to Am. Compl.) Sheehan's counsel denied liability in a letter dated July 8, 2004. (Ex. C to Am. Compl.) Because Sheehan had knowledge of the damage to the Aligs' home prior to the policy period,[9] the court finds that had there been any "property damage" to the Alig home caused by an "occurrence," that damage would not be covered under the Policy.[10]

## VI.    Bad Faith Denial Claim

The final issue before the court is Sheehan's counterclaim alleging a "bad faith" handling of Sheehan's claim. Sheehan argues that Westfield acted in bad faith by: failing to fully investigate the Aligs' and Class Members' claims before denying coverage; having no rational basis for denying coverage; initially agreeing to defend Sheehan then changing its mind; and by interfering with Sheehan's ability to defend itself

---

[9]   Westfield has not alleged that Sheehan had any knowledge of damage to other Class Members' homes prior to the October 1, 2004 inception date of the policy. Accordingly, this exclusion is only applicable to the Aligs' claim against Sheehan.

[10]   Again, Sheehan has not made a counter-argument on this issue, and has waived any objections it had to it. *See Watson, supra* note 7, 822 N.E.2d at 1027.

in the underlying lawsuit.  Sheehan further argues that due to Westfield's bad faith

actions, it is entitled to punitive damages.

### A.       Duty to Act in Good Faith

Indiana first recognized a tort claim against an insurer for breaching their duty to

deal in good faith with an insured in *Erie Insurance Co. v. Hickman*, 622 N.E.2d 515

(Ind. 1993).  There, the Indiana Supreme Court held that:

> The obligation of good faith and fair dealing with respect to the discharge
> of the insurer's contractual obligation includes the obligation to refrain from
> (l) making an unfounded refusal to pay policy proceeds; (2) causing an
> unfounded delay in making payment; (3) deceiving the insured; and (4)
> exercising any unfair advantage to pressure an insured into a settlement of
> his claim.

622 N.E.2d at 519.  The Court explained that neither "a good faith dispute about . . .

whether the insured has a valid claim at all" nor "the lack of diligent investigation alone"

will support an award for breach of the duty to act in good faith.  *Id.* at 520.  Instead, to

prove that an insurer acted in bad faith, "the plaintiff must establish, with clear and

convincing evidence, that the insurer had knowledge that there was no legitimate basis for

denying liability."  *Masonic Temple Ass'n of Crawfordsville v. Ind. Farmers Mut. Ins.

Co.*, 779 N.E.2d 21, 26 (Ind. Ct. App. 2003) (citing *Freidline v. Shelby Ins. Co.*, 774

N.E.2d 37, 40 (Ind. 2002)).

As with other tort claims, punitive damages may be awarded for breach of the duty

to act in good faith only if there is clear and convincing evidence that the insurer "acted

with malice, fraud, gross negligence, or oppressiveness which was not the result of a

mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Erie Ins.*, 622 N.E.2d at 520 (citing *Bud Wolf Chevrolet, Inc. v. Robertson*, 519 N.E.2d 135, 137-38 (Ind. 1988)). Of course, one must successfully prove a cause of action for compensatory damages before punitive damages may even be considered. *Crabtree v. Estate of Crabtree*, 837 N.E.2d 135, 137-38 (Ind. 2005).

### A.      Breach of Contract Not Necessary for Bad Faith Claim

Westfield argues that, as a matter of law, Sheehan is precluded from alleging bad faith because Westfield was ultimately correct in denying coverage. (Pl.'s Mem. in Supp. 28.) It argues that a plaintiff must establish as a threshold element a breach of contract, which is not present in this case. (*Id.*)

The tort action recognized in *Erie Insurance* requiring an insurer to act in good faith with an insured is distinct from the duty to not breach the insurance contract. *Erie Ins.*, 622 N.E.2d at 520 ("[A]n insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort"). Therefore, an insurance company which is ultimately correct in denying a claim may still be liable for acting in bad faith if they had no "rational, principled basis" for denying coverage. *Id.* Accordingly, despite the court's determination that Westfield was correct in denying coverage to Sheehan, the court must consider whether its initial denial of coverage was made in bad faith, as Sheehan alleges.

### B.      Westfield Had a Legitimate Basis for Denying Coverage

In both its December 30, 2004, and March 30, 2006, letters to Sheehan denying

defense and coverage, Westfield explained its understanding that under Indiana law, specifically *R.N. Thompson* and *Amerisure*, the Aligs' complaint did not allege the existence of "property damage" or an "occurrence," and that even if it did, certain exclusions in the Policy prevented Sheehan's coverage.  (Pl.'s Exs. 1 & 6.)  These denials of coverage, are sufficiently based on Indiana case law and the facts of the underlying lawsuit for the court to find that, as a matter of law, Westfield acted rationally and in good faith in determining that it would deny Sheehan's claim for coverage.  The court finds that no rational trier of fact could find that Westfield's denial demonstrates any "dishonest purpose, moral obliquity, furtive design, or ill will" that is necessary for finding bad faith.  *Monroe Guar. Ins. Co. v. Magwerks Corp.*, 829 N.E.2d 968, 977 (Ind. 2005) (citing *Colley v. Ind. Farmers Mut. Ins. Group*, 691 N.E.2d 1259, 1261 (Ind. Ct. App. 1998)).

### C.      Sheehan's Additional Allegations of Bad Faith

Sheehan additionally points to three separate bases for its claim that Westfield acted in bad faith in denying coverage:  inadequately investigating the claim; initially agreeing to defend then revoking that offer; and interfering with Sheehan's defense of the underlying lawsuit.

### 1.      Adequacy of Westfield's Investigation

Assuming that Sheehan is correct in arguing Westfield did not adequately investigate the Aligs' and Class Members' claims prior to denying Sheehan's request for coverage, *Erie Insurance* is clear that this lack of investigation, without more, is an

insufficient basis for a finding of bad faith.  622 N.E.2d at 520.  The court has already determined that Westfield acted rationally in denying coverage; therefore, its alleged lack of adequate investigation is irrelevant under *Erie Insurance*.  Therefore, this claim fails as a matter of law.

### 2.     Initial Agreement to Defend

Sheehan also claims that Westfield's claim representative, Wendy Dean, agreed to defend Sheehan in the underlying lawsuit.  On November 9, 2005, Sheehan's coverage counsel, Brad Huber, forwarded an email to Westfield's coverage counsel, Mark Smith, indicating that Ms. Dean had agreed to defend Sheehan.  (Pl.'s Ex. 3.)  Later, that same day, Mr. Smith responded by saying that, according to his understanding, Ms. Dean had *not* promised to defend Sheehan.  (Pl.'s Ex. 4.)  Assuming Ms. Dean actually did agree to defend Sheehan, Sheehan has presented no clear and convincing evidence that the initial agreement and subsequent denial were made in bad faith.  Mr. Smith's prompt attempt to clarify Ms. Dean's statement is evidence to the contrary, indicating that any agreement by Ms. Dean was a good faith case of miscommunication on the part of Westfield. Therefore, this claim also fails as a matter of law.

### 3.     Interference With Sheehan's Defense in the Underlying Lawsuit

Finally, Sheehan argues that Westfield acted in bad faith by interfering with Sheehan's ability to defend itself in the underlying lawsuit.  Sheehan argues it was prejudiced by Westfield joining as defendants the Aligs and the Class Members, plaintiffs in the underlying suit, and by Westfield's continuing to litigate this action after Sheehan

notified it as to the prejudicial effect of this action on Sheehan's defense in the underlying lawsuit. Further, it argues that Westfield's failure to participate in mediation sessions was a demonstration of bad faith. Westfield contends that continuing this litigation and the inclusion of the Aligs and Class Members as parties were necessary actions.

Injured parties have often been held to be necessary parties under Federal Rule of Civil Procedure 19 in declaratory judgment actions by insurance companies seeking to determine their liability. *See, e.g., American Std. Ins. Co. v. Rogers*, 123 F. Supp. 2d 461, 467 (S.D. Ind. 2000). Further, there is some Indiana precedent to suggest that a declaratory judgment would not be binding on the Aligs or Class Members if they were not parties to this action. *See Araiza v. Chrysler Ins. Co.*, 699 N.E.2d 1162 (Ind. Ct. App. 1998) (holding that a default judgment issued against an insured in a policy coverage dispute was not binding on the injured third party). With this in mind, the court is satisfied that Westfield had a rational basis for adding the Aligs and the Class Members as defendants in this suit, and as a matter of law, did not exhibit bad faith in doing so.

With regard to the allegation of continuing to litigate after Sheehan notified Westfield of the potential prejudicial effect of this action, Sheehan has presented no evidence of how Westfield acted in bad faith by doing so. There is no evidence suggesting Westfield acted with ill will in filing this suit or in refusing to enter into a tolling agreement with Sheehan. Accordingly, the court finds no bad faith on the part of Westfield in continuing with this litigation, despite any prejudicial effect this action had on Sheehan's defense of the underlying lawsuit.

Sheehan does not explain how failing to participate in mediation sessions was an act of bad faith.  Westfield had already notified Sheehan that it would not defend Sheehan in the underlying lawsuit, so Sheehan had no reasonable expectation that Westfield would attend any mediation.  The court finds no evidence of any bad faith associated with Westfield's failure to attend any mediation sessions.

Overall, the court finds no evidence of bad faith dealings by Westfield, either on the issue of Westfield's basis for denying coverage or Sheehan's three additional claims. Westfield is thus entitled to summary judgment on the breach of the duty to act in good faith claim.

### D.    Punitive Damages

Because Sheehan has failed to make out its cause of action for bad faith, it may not recover punitive damages.  *See Crabtree*, 837 N.E.2d at 137-38.

## VII.   Conclusion

For the foregoing reasons, Plaintiff Westfield's Motion for Summary Judgment (Docket # 76) is **GRANTED**, and Defendants' Motion for Summary Judgment (Docket # 81) is **DENIED.**

**SO ORDERED** this   29th   day of August 2008.

 

 

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies To:

David F. McNamar
MCNAMAR & ASSOCIATES
dfmcnamar@mcnamarlaw.com


Mark R. Smith
SMITH FISHER MAAS & HOWARD, P.C.
msmith@smithfisher.com